## Case No. 14,698.

### UNITED STATES v. BUTLER.

[1 Cranch, C. C. 422.] [1]

Circuit Court, District of Columbia.   July Term, 1807.

#### WITNESS—APPEARANCE—CASE CONTINUED.

If a witness appear in court at the term mentioned in his recognizance, and no default be entered against him at that term, and the recognizance be not respited, he is not bound by the recognizance to attend at the following term, although the cause should be continued.

Scire facias against a surety of a witness, bound by recognizance to appear at June term, 1804, and not to depart without leave of court. The breach assigned was that the witness failed to appear according to the recognizance. Upon the trial of the issue the evidence offered, to show the breach, was a record of November term. 1804. stating that the witness was called and failed to appear. There was no record of the respite of the recognizance, nor of a continuance of it, nor of any order for the witness to attend again. It appeared, upon the record of June term, that the witness was allowed for four days' attendance on the prosecution at that term.

## Case No. 14,699.

### UNITED STATES v. BUTLER.

[2 Cranch, C. C. 75.] [1]

Circuit Court, District of Columbia.   June Term, 1812.

## Case No. 14,700.

### UNITED STATES v. BUTLER et al.[1]

[1 Hughes, 457.] [2]

Circuit Court, D. South Carolina.   April 1877.

INDICTMENT—FINDING AND ENTRY—GRAND JURY —CHALLENGE TO ARRAY—PETIT JURORS—CHALLENGES—CONSPIRACY—CIRCUIT COURT JURISDICTION.

1. It is not necessary that the finding of a grand jury upon a bill of indictment presented by them should be read in open court.

2. The handing of the bill to the clerk in open court, and the entry of it by him on the records, is a sufficient publication of the finding of the grand jury.

3. A challenge to the array of the grand jury cannot be made after the jury is organized and has entered upon its duties.

4. The jurisdiction of the United States circuit court for the district of South Carolina extends throughout the entire state.

5. The district attorney is not bound to furnish the defendants with the names of the prosecutor and witnesses in a criminal case not capital.

6. In challenging the petit jurors. the right of peremptory challenge need not be exercised until the opportunity of rejecting for cause is afforded.

7. In presenting jurors for challenge, the government must first exercise its right, and then the defence.

8. As the government is allowed the right of peremptory challenge. it cannot ask a juror to stand aside until the panel is exhausted before challenging for cause or peremptorily.

9. It is a good cause of challenge to a juror, that he has voluntarily joined the Rebellion. See Rev. St. § 820.

10. To convict under this indictment, for conspiracy contrary to the provisions of sections 5508 and 5520, Rev. St., it is not necessary to find that the conspiracy charged was formed against the voter named in the indictment alone. It is sufficient if it is made to appear that he was included among persons actually conspired against.

11. Every member of a conspiracy is responsible, personally, for the acts of every member thereof, done in furtherance of its illegal purposes, whether he be himself present or not.

12. A "reasonable doubt" is something more than a captious doubt. It must be a doubt for which a reason can be given.
[Cited in U. S. v. Stevens, Case No. 16,392.]

13. All citizens of the United States, whether white or black, are included within the protection of the statute alleged to have been violated by the defendants.

This was an indictment for conspiracy against one David Bush to prevent him from giving his support in favor of the election of one Robert Smalls as a member of congress, etc. The indictment was drawn under the provisions of sections 5508 and 5520 of the Revised Statutes of the United States. It

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] This report of the case has been prepared for this volume [1 Hughes] by William Stone, Esq., late United States Attorney for South Carolina.
[2] [Reprinted by permission.]

consisted of five counts as originally drawn, but the first count was held bad upon demurrer.

[An information filed by the district attorney against the same parties was quashed. Case No. 14,701.]

The indictment was as follows, the formal parts being omitted:

First Count. That Andrew Pickens Butler, George W. Croft, August P. Brown, Abner W. Atkinson, George W. Bush, George B. Bush, Paul F. Bowers, Augustus McDaniels, William S Bush, John Bowers, Whitmore W. Stallings, and John M. Bush, together with divers other evil-disposed persons, to the jurors aforesaid as yet unknown, late of Aiken county, South Carolina, on the 18th day of September, A. D. 1876, at Aiken county, in the state of South Carolina, in said district, and within the jurisdiction of this court, unlawfully did conspire together to prevent, by force, intimidation, and threat, one David Bush, a male citizen of the state of South Carolina, and of the United States, who was then and there lawfully entitled to vote at any election by the people in said county, state, and district, from giving his support and advocacy in a legal manner toward and in favor of Christopher C. Bowen, John Winsmith, Thomas B. Johnston, Timothy Hurley, William B. Nash, Wilson Cooke, and William F. Meyers, lawfully qualified persons, as electors for president and vice-president of the United States, contrary to section 5520 of the Revised Statutes of the United States, etc.

Second Count. That Andrew Pickens Butler, etc., together with divers other evil-disposed persons, to the said jurors now unknown, late of Aiken county, in the state of South Carolina, on the 18th day of September, 1876, at Aiken county, in the state of South Carolina, in said district, and within the jurisdiction of this court, unlawfully did conspire together to prevent, by force, intimidation, and threat, one David Bush, a male citizen of the United States and of the state of South Carolina, who was then and there lawfully entitled, as an elector, to vote at any election by the people in said county, state, and district, from giving his support and advocacy in a legal manner toward and in favor of the election of one Robert Smalls, a lawfully qualified person, as a member of the forty-fifth congress of the United States, contrary to section 5520 of the Revised Statutes of the United States, etc.

Third Count. That Andrew Pickens Butler, etc., together with divers other evil-disposed persons, to the jurors aforesaid now unknown, late of Aiken county, in the state of South Carolina, on the 18th day of September, in the year 1876, at Aiken county, in the state of South Carolina, in said district and within the jurisdiction of this court, unlawfully did conspire together to injure in his person and property one David Bush, a male citizen of the United States and the state of South Carolina, of African descent, who, then and there, was lawfully entitled to vote at any election by the people in said county, state, and district, on account of his giving his support and advocacy in a legal manner in favor of the election of one Robert Smalls, a lawfully qualified person, as a member of the forty-fifth congress of the United States, contrary to section 5520 of the Revised Statutes of the United States, etc.

Fourth Count. That Andrew Pickens Butler, etc., together with divers other evil-disposed persons, to the jurors aforesaid as yet unknown, late of Aiken county, in the state of South Carolina, at Aiken county, in the state of South Carolina, in said district, and within the jurisdiction of this court, on the sixteenth day of September, in the year eighteen hundred and seventy-six, unlawfully did conspire together to injure, oppress, threaten, and intimidate one David Bush, a male citizen of the United States, and of the state of South Carolina, of African descent, of the age of twenty-one years and upwards, and duly qualified to vote at any election by the people in said county, state, and district, in the free exercise of the right and privilege secured to him by the laws of the United States, to wit, in the free exercise of the right and privilege secured to him by section two thousand and four of the Revised Statutes of the United States to vote at a general election by the people, held on the Tuesday next after the first Monday in November, A. D. one thousand eight hundred and seventy-six, without distinction of race, color, or previous condition of servitude, on account of the race and color of him, the said David Bush, contrary to the provisions of section five thousand five hundred and eight of the Revised Statutes of the United States, etc.

Fifth Count. That said Andrew Pickens Butler, etc., together with divers other evil-disposed persons, to the jurors aforesaid as yet unknown, late of Aiken county, South Carolina, on the sixteenth day of September, A. D. eighteen hundred and seventy-six, at Aiken county, in the state of South Carolina, in said district, and within the jurisdiction of this court, unlawfully did conspire to injure, oppress, threaten, and intimidate one David Bush, a male citizen of the United States, and of the state of South Carolina, of African descent, of the age of twenty-one years and upwards, and duly qualified as an elector, to vote at any election by the people in said county, state, and district, for representatives in the congress of the United States, in the free exercise of the right and privilege secured to him by the laws of the United States, to wit, in the free exercise of the right and privilege secured to him by section two thousand and four of the Revised Statutes of the United States to vote, without distinction of race, color, or previous condition of servitude, for a representative in the congress of the United States from the Fifth congressional district of the state of South

Carolina, at an election held on the Tuesday next after the first Monday in November. A. D. one thousand eight hundred and seventy-six, on account of the race and color of him, the said David Bush, contrary to the provisions of section five thousand five hundred and eight of the Revised Statutes of the United States, etc.

On the case being called, on motion of the defendants' counsel, the case against A. P. Butler was continued, on the ground that he was a member of the state senate of South Carolina, which was then in session. The counsel for the defence moved that their clients be not compelled to answer to the indictment, on the ground that it was not a legal indictment, as there had been no formal publication of the finding of the grand jury in court.

BOND, Circuit Judge, stated that he remembered the circumstances of the finding of this indictment. It had been brought in by the grand jury, the foreman had handed it to the clerk, by whom it was handed to the court for inspection, and afterwards it was handed back to the clerk for entry. The names of the grand jurors had been called out, and they had been asked if this was their finding, and they had answered that it was. That the handing of the indictment to the clerk, and the entry of it on the record was all the publication ever intended. It was not meant that the whole world should know who were indicted, and for what offences, because the accused could then escape.

WAITE, Circuit Justice, stated that he had never known any other practice.

The counsel for the defendants continued to urge their objection to the indictment upon this ground, but the court adhered to its ruling. The defendants' counsel then challenged the array of the grand jury on several grounds, the principal of which were the following: The grand jurors who were summoned and appeared at the present term of the court were not designated, according to the mode of forming such juries, then practiced in the state courts of the state of South Carolina so far as such mode was practicable in this, that the commissioners who selected the citizens whose names were placed on the jury list, were designated by officers in the judiciary department of the United States government, and were not officers elected by the people, nor appointed by the executive department, as are the like jury commissioners elected and appointed by the state laws which regulate the practice of forming juries in the state courts, and that for the purpose of forming said juries, neither the rule LI of the circuit courts of the United States for the district of South Carolina, nor the order of the circuit court of December 8th, 1876, under which the said juries were formed, conformed the designation and impanelling of juries to the laws and usages relating to jurors in the state courts, in force in said state, at the date of such order as required by section 800 of the Revised Statutes of the United States. That the commissioners so designated by the order of the court for the selection of said juries were themselves officers of the government, and were not calculated to be most favorable to an impartial trial in cases of prosecutions by the government. That the writs of venire were served and returned by the United States marshal for the Eastern district of South Carolina, R. M. Wallace, Esq., who is not "an indifferent person," as required by section 803 of the United States Revised Statutes. That the array of grand jurors returned and accepted is composed of five persons who are not in the venire, and are not returned as additional grand jurors as required by section 808 of the United States Revised Statutes, having been returned as additional jurors by the United States marshal under an order of a judge of the United States court, not issued in the case contemplated by said section, viz., "If, of the persons summoned, less than sixteen attend, they shall be placed on the grand jury, and the court shall order the marshal to summon, either immediately, or on a day fixed, from the body of the district, and not from the bystanders, a sufficient number of persons to complete the grand jury;" whereas these challengers say that eighteen of the grand jurors summoned appeared, and the additional grand jurors summoned by said order were not necessary to complete said grand jury. The additional grand jurors so summoned were not from the body of the district, as required by section 808 of the Revised Statutes.

The commissioners designated by the said order of 8th December, 1876, were not persons residing in the Eastern district of South Carolina. The citizens selected by the said commissioners were not selected from the several counties composing the district of the state in which the trial is proposed to be had, in which the accused reside, and in which the alleged offences were said to have been committed, viz., the Eastern district of South Carolina; but a portion of the citizens so selected were selected from counties within the Western district of said state. The court disallowed the challenge to the array on the ground that such a challenge must be made before the jury is impanelled, and that it cannot be made after it has been organized and has entered upon the discharge of its duties. As to the objection that the grand jurors were not all drawn from the Eastern district of South Carolina, the court held: "As to the question of the jurisdiction of this court throughout the entire state of South Carolina, we decide, for the purposes of this trial, in favor of the jurisdiction. This is in accordance with the uniform practice of the court, without objection from any quarter, for nearly half a century. If, after the trial, it is thought desirable to bring the point again to our attention we will consider it, and, in case of disagreement between us as to its

proper determination, certify it to the supreme court for decision."

It was then moved to quash the indictment upon the same grounds as those urged in the challenge to the array, but the court overruled the motion. A demurrer was thereupon filed to the indictment.

The grounds of demurrer were substantially as follows: As to the first count—(1) That the force, intimidation, and threat therein charged are not particularized. (2) That the support and advocacy therein set forth are not particularized. (3) That the legal manner of giving such support and advocacy is not particularized. (4) That the support and advocacy are not stated to be in favor of the persons named as electors. (5) That the persons named as electors are not stated to have been qualified at any time or place. (6) That no place in Aiken county has been specified as the place where the alleged conspiracy was formed. (7) That no election, nor time, nor place thereof is alleged. As to the second count—Same as to first count except (4) That Robert Smalls is not stated to have been a lawfully qualified person as member of congress at any time or place. (5) That it is not stated that the said Robert Smalls was a candidate. (6) That it is not stated from what state or congressional district said Robert Smalls was to be elected, nor from what congressional district he was a lawfully qualified person as a member of congress. As to the third count—Same as first count, except 2d and 5th grounds. (2) That no mode or means of injuring the said David Bush in his person or property is alleged. (5) That it is not stated from what congressional district the election of said Robert Smalls was sought to be supported and advocated, nor from what election district he was a lawfully qualified person as a member of congress. That as to all of said first, second, and third counts in said indictment, race, color, or previous condition is not alleged to be the motive or object of said conspiracy. As to the fourth count—(1) That the injuring, oppressing, threatening, and intimidating therein charged are not particularized. (2) That the description of general election and of the people who were to vote thereat is too vague and indefinite. (3) That the election mentioned therein is described as an election held, and not as one to be holden. (4) That David Bush is alleged as qualified to vote without specification of time or place. (5) That the race and color of said David Bush, on account of which the offence is alleged to have been committed, are not specified. (6) That the right and privilege therein alleged to be secured to the said David Bush by section 2004 of the Revised Statutes of the United States as matters of law, are not secured by said section. (7) That section 5508 does not prohibit or punish the violation of the specific rights declared and set forth in section 2004, and the alleged violation of rights and privilege specifically declared in section 2004 is not in law contrary to the provisions of section 5508, as alleged. As to the fifth count—Same as to the fourth count except third. (3) That no such election as that at which David Bush is alleged as duly qualified as an elector to vote, can be holden. As to all of said counts—(1) That no one of said counts alleges with sufficient particularity the election at which David Bush was lawfully entitled to vote. (2) That the conspiracy charged in each and every count is alleged in terms too vague, general, insufficient, and uncertain to afford the accused proper notice to plead and prepare their defence, and they set forth no specific offence under the law. (3) That no one of said counts contains a charge of criminal matter, indictable under the constitution and laws of the United States. (4) Because each of the sections under which this prosecution is prosecuted, in so far as it creates offences and imposes penalties, is without warrant from the constitution, and is an infringement of the sovereignty of the states and the people. (5) That this court has no jurisdiction to take cognizance of the offences set forth in any of said counts. (6) That no criminal intent is alleged in any one of said counts.

William Stone, U. S. Atty., E. Earle, Asst. U. S. Atty., and D. T. Corbin, for the United States.

James Aldrich, Le Roy F. Youmans, Simonton & Barker, D. S. Henderson, C. Richard Miles, and Edward McCrady, Jr., for defendants.

After argument by the defendants' counsel and the counsel for the United States, the court, by WAITE, Circuit Justice, pronounced the following opinion as to the demurrer:

The first count is bad. Section 5520 makes it an offence to conspire to prevent by force, etc., any citizen, etc., from giving his support or advocacy, in a legal manner, toward or in favor of the election of any legally qualified person as an elector for president or vice-president. In this count the allegation is not that the support or advocacy to be prevented was of the election of the persons named as electors, but of the persons themselves. The offence consists only in the conspiracy to prevent the support and advocacy of the election. The demurrer to this count is, therefore, sustained. As to the other counts the demurrer is overruled, without prejudice, however, to the rights of the defendants to renew their objections upon a motion to arrest, if they shall so desire.

The defendants thereupon severally pleaded "not guilty."

The counsel for defence asked that they be furnished by the district attorney with the names of the prosecutor and the witnesses, but the CHIEF JUSTICE stated that there was no practice justifying such a demand.

It was then moved that the government be required to elect one of the four counts of

the indictment upon which to proceed. The counts charge offences under different statutes. the penalties being different. They also charge offences growing out of different transactions, and they charge offences growing out of transactions on different days, the offences charged in the first two counts being alleged to have been committed on the 18th September, and those in the last two on the 16th September.

BOND, Circuit Judge, announced the decision of the court that there was no reason to compel the government to elect at that stage of the proceedings.

Counsel for the defence then asked the privilege of entering a challenge to the array of the petit jury (pro forma), on the same grounds as the challenge to the grand jury. Granted.

Mr. Youmans, for the defence, said that before the clerk proceeded to impanel the jury he would like to ask for information whether the peremptory challenges must be exhausted before any challenge for cause was made, or vice versa, or whether it was a matter of indifference.

BOND, Circuit Judge, replied that counsel might do either one or the other, but as there were only three peremptory challenges, it would be very foolish to exhaust them before challenging for cause.

After some further discussion it was decided that each juror should be subject first to the challenge of the government, and afterwards of the defence.

The impanelling of the jury was proceeded with, until one Haines was called. He was examined on his voir dire, and was then told by the counsel for the government to stand aside. The defence objected, and insisted that the prosecution must either exercise its right of challenge or waive it entirely and at once. For the prosecution it was contended that the right of qualified challenge in the courts of the United States was sustained by the supreme court of the United States in the case of U. S. v. Marchant, 12 Wheat. [25 U. S.] 480. The rule laid down in that case was subsequently followed in the circuit court for the Eastern district of Pennsylvania in the case of U. S. v. Wilson [Case No. 16,730]. The court held that this rule was in force when the government had no right of peremptory challenge, but as the right of challenging jurors peremptorily has been given the prosecution, it should stand on the same footing with the defence, and either exercise the right of challenge at once or not at all.

When Hutson Lee was called, and while under examination on his voir dire, he was asked whether he had not voluntarily served in the Confederate army. He replied that he had. He was thereupon challenged for cause, in accordance with the provisions of section 820 of the Revised Statutes. The counsel for the defence objected to the challenge on the ground that the disqualification had been removed, together with other disabilities. And on the further ground that congress had no right to append a penalty to a statute regulating the qualifications of jurors. The court decided that it was not a penalty, but a right of challenge given to the government by positive act of congress, which the court had no choice but to observe until it was repealed.

The jury being impanelled, each juror was required to take and subscribe the special oath as provided by section 822 of the Revised Statutes.

The examination of witnesses continued for ten days. Only a brief narrative of the events testified to can be given. To an understanding of them, a description of the place where they occurred is necessary. The Port Royal Railroad extends from Augusta to Port Royal and Beaufort. It crosses the Savannah river a few miles below Augusta, at a point known as the Sand Bar Ferry. A few miles below the point of crossing is a station called Jackson's. Seven or eight miles further down is another station called Ellenton. Here is a settlement of some five or six families, containing about ten white male adults. The county line separating Barnwell county from Aiken county is between two and three miles east of Ellenton. A mile to the north of Ellenton is a stream which empties into the Savannah river, called the Upper Three Runs. It is crossed at a point known as the Union Bridges, one and a half miles from Ellenton, and at Rouse's Bridge, four or five miles further up the stream. Aiken and Augusta are each about twenty miles distant from these bridges, the former being nearly due north from them, the latter northwest from them. Barnwell Court House is about eighteen miles due east from Rouse's Bridge. No villages are between Ellenton or Rouse's Bridge and any of these points.

The government did not attempt to prove the existence of the conspiracy alleged in the indictment, except by circumstantial evidence. The evidence for the prosecution was therefore directed to proof of acts done and declarations made by the alleged conspirators before and at the doing of the overt acts.

As to the acts proved: On Friday, September 14th, 1876, one Peter Williams, a young colored man, was taken from the house of another colored man where he had been staying, by several white men, and told that he had to go to a trial justice's for an alleged assault on one Mrs. Harley and her son, a boy of nine or ten years of age. He was taken to the road, where Mr. Harley, the husband of Mrs. Harley, and others were. was struck three times by him in the face, then, after turning away, and endeavoring to run from his captors, he was pursued and shot at, and severely wounded. From the effects of these wounds he died several days afterwards. After he was shot he was put on a wagon by Harley and his friends, and taken to his (Harley's) house. Here Mrs. Harley was called out to see him. She said he was not the man who struck her. While

lying in the wagon, one of the white men put a pistol to his heel and shot him, the ball coming out at the calf of the leg. He was taken a short distance up the road, thrown into a fence corner, and a white man stood guard over him, declaring that he should not be moved until he died. Later that afternoon a writ was issued by Trial Justice Griffin (colored) for the arrest of this Peter Williams and one Pope for the assault on Mrs. Harley. Angus P. Brown, one of the defendants, was deputed as a special constable to serve it. On Saturday the whites, to the number of nearly two hundred, gathered near Mrs. Harley's with arms and mounted. Harley lived seven or eight miles northwest from Rouse's Bridge. The whites, under command of Angus Brown, left Harley's Saturday afternoon to go in the direction of Rouse's Bridge. They passed the store of one Chavis, where a few colored men had been in the habit of meeting on Saturday afternoon to talk over matters of interest to them. The members were Republicans. As the whites passed the store they made threats against a prominent colored Republican named Holland, who had been a trial justice in Aiken county. Afterwards a large body of armed white men gathered in the neighborhood of Hamburg, and went down towards Rouse's Bridge to join Brown's forces. Saturday night many of the whites staid at Matlock Church, a few miles northwest from Rouse's Bridge. Sunday afternoon they went towards the bridge. The main body numbered between two and three hundred. The Hamburg company had joined them at this time. Colonel A. P. Butler had met Captain Angus Brown on Saturday, and on Sunday he had command of the whites. They halted in an old field, a short distance from the bridge, and remained there some time. While they were there, three colored men were shot. One of them, Henry Campbell, was trying to escape from some whites who had taken him prisoner, and who had taken away from him his gun. He afterwards died from his wounds. The two others were without arms when shot, and were trying to get out of the way of the whites. The movements of the whites had alarmed the colored men, and a small party of them were near Rouse's Bridge on Sunday. Some of them had arms. After three of their number had been shot, the whites sent to them to have a "compromise." Six from each side went near Weatherby's store, a short distance west of the bridge. The whites said they had a warrant for Frederick Pope, and exhibited it. The colored men said he was not with them, and that if they found him they would take him to Aiken and deliver him up. Both parties then agreed to go home. That afternoon, on the south side of the Union Bridges, some of the colored men had assembled at a place where they held their religious meetings. They were greatly alarmed at the action of the whites, and most of them concluded to

sleep in the woods that night, and remain together as much as possible. Just at dusk, some of the whites who had been at Rouse's Bridge came across Union Bridges on their way home. They passed the colored people without molestation. A gun was fired after a man named Ashley had passed. It was probably discharged by one of the negroes. No one was injured by it. Soon afterwards a body of whites came up to the bridge and fired into the negroes, killing one of their number, Basil Bryant, instantly. Some of the negroes then returned the fire, and a fusilade was kept up a few minutes from both sides. No serious injuries followed. The whites turned back and the negroes remained in the swamp near the bridge. Monday, the negroes from the neighborhood of Rouse's Bridge came to Union Bridges. They consulted together as to their course. They, then, went to Ellenton to the number of seventy-five or one hundred. Many had arms. They, remained there an hour or so. Here they were met by one Simon Coker, a colored man, who was a member of the legislature from Barnwell county. He lived at Robbins's, a station on the Port Royal Railroad, seven miles southeast from Ellenton. Coker advised them to go home, as he didn't think the white people would trouble them. They took his advice and left in the direction of their homes. Sunday night most of the whites remained at Myers's, eight or ten miles from Rouse's Bridge, on the Augusta road. Sunday afternoon a messenger was sent to Aiken, and Captain G. W. Croft took command of a party of white men, who left there late Sunday night for Ellenton. But the colored people had sent messengers to Aiken, who had reported on Sunday afternoon to the sheriff of that county that the whites were shooting some of their men, and asking him to go down and protect them from further violence. He did not conclude to go until Monday morning. When he did leave he took along his son and three other white men as a posse. He reached Myers's that afternoon and remained there. Croft's company joined the whites about Cowden plantation, near Jackson's Station. The entire body, under Colonel Butler, went towards the railroad. A freight train had run off the track that morning one and a half miles below Jackson's, and the engine and some cars had fallen over on the side of the track. As the whites advanced their skirmishers were thrown out, and by some of the number a negro named Finissee, seen near the track, was shot to death. He was unarmed at the time; after he was shot his right ear was cut off. The whites then proceeded towards Ellenton, crossing the runs at Union Bridges. On their way, a portion of the column went to the house of a colored woman named Joanna Bailey. Two of the defendants, Paul and John Bowers, went into the house and found there one Wilkins Hamilton, a nephew of Joanna. He had been shot in the leg the

night before at Union Bridges. He was unarmed when these two entered the house, and offered them no resistance. Five pistol-balls were shot into him by these two men, in the presence of his aunt, killing him instantly. They rejoined the column, and proceeded with it to Ellenton. Near the station they killed another colored man, John Kelsey, who was trying to escape from them. Afterwards the column turned and went by the house of some colored people named Kelsey. Six young colored men had eaten dinner there. As they heard the advancing column of mounted men they ran from the house. David Bush and Sam Brown, a deaf and dumb boy, were killed by the whites in the field near the house. Warren Kelsey was killed in his yard, in the presence of his wife and family, while begging for his life and promising to vote the Democratic ticket. The whites, after going about a mile beyond this place, returned to Ellenton. The main body of them encamped there that night.

The following morning the whites moved towards Rouse's Bridge, by the road on the east side of the runs. The negroes who were in the swamp above the bridge heard a great shouting from the women about nine o'clock in the morning, that "the Yankees had come." They therefore came out of the swamp, and found that a detachment of United States troops, under the command of Captain Lloyd and Lieutenant Hinton, had marched from Aiken pursuant to orders from General Ruger, to see what was going on. They halted not far from Rouse's Bridge, on the west side of the runs. The negroes were delighted at the arrival of the United States soldiers. Some of them were on their knees praying, and saying, "Thank God, the Yankees have come." As some of the negroes came up there was firing heard towards the swamp, and the officers were told that the whites had shot one of the colored men. Presently there was a cry, "Here they come." Captain Lloyd and Liutenant Hinton looked down the road and saw an armed body of white men approaching. They walked down the road to meet it. They stopped and spoke to one man at the head of the column. While they were talking with him Colonel Butler came up and asked what they proposed? They replied they had nothing to propose. Afterwards Captain Croft and another man were sent to them by Colonel Butler, and they were asked what their orders were. They said simply to preserve the peace. Croft asked if they would disperse the negroes should the whites leave for home. They replied they would advise them to go home, and had no doubt they would do so. In about half an hour the whites rode off in the direction of Myers's and Augusta. The officers estimated the number of white men at between 300 and 400, all well armed and mounted. The negroes in the swamp were estimated at from 75 to 100, and their arms were very poor; many had no arms at all.

About the time of the conference between the army officers and Colonel Butler at Rouse's Bridge, a party of white men who had remained at Ellenton, and who were apparently under the orders of O. N. Butler, of Augusta, went to Robbins's Station on the Port Royal road. A construction train and a passenger train went down there, and the party under Butler found Simon Coker, who has been before alluded to as the man who had been at Ellenton the day before, and who had advised the negroes to disperse. He was going to the railroad station for the purpose of going down the road to Tennessee. He had his satchel in his hand, and was unarmed when taken prisoner by Butler's men. Both trains backed up to Ellenton, and Coker was taken out of the car. He was surrounded by many of the white men, and did not seem to realize that his life was in danger. About twelve o'clock, he was taken to an old field some 200 or 250 yards distant. The whites surrounded him, and a volley of bullets was shot into him, killing him instantly. He was left to lie where he had fallen, but after his death his pockets were examined by those who had participated in killing him. O. N. Butler, with several of the men who were at Ellenton when Coker was killed, had come down from Augusta on Monday morning in the train, and had got off at Jackson's Station with his men. They were all well armed. They met the whites under command of A. P. Butler near the wrecked train on Monday forenoon, and went with them to Ellenton and co-operated with them on Monday forenoon. On Tuesday afternoon, after Coker had been killed, a body of seventy or eighty white men, among whom were some of the men who had been with Colonel Butler at Rouse's Bridge on that morning when he said the whites would disperse and go peaceably to their homes, came to a field by the roadside about three miles below Ellenton, in which were William Goodwin and his son Charles, and Robert Turner and his son George, all colored, picking cotton.

Robert Turner thus described what followed: "They flung open the big gate, and they all poured in like a storm, and went down to William Goodwin and took him and carried him outside of the fence, and enlisted him with the horse company; and my son had gone outside in the wood whilst they were tangling about, and he came back in the house and got in the house and sat down. . . . . They hunted all about in the cribs and the fodder-loft and everywhere else. They spied him, I suppose, when he went off out of the field. They couldn't find him. After awhile two of them went into the house. . . . . They took him out of the house. His wife beckoned to me. . . . . I went to them and begged them not to kill my son; he was sick, and I knew he never would go out in any riot. I asked them, 'Please not to kill him; he is a poor sickly creature, and he never got in any disturb-

ance.' . . . . Then they carried him off in the woods, him and William, to a thicket by the side of the branch, and killed him. . . . . I took my little wagon, and went and found him dead, and hauled him and fixed him and buried him." William Goodwin's body was found the next day, with nine bullet-holes through it, in the swamp about one hundred yards from where George Turner had been killed.

On the following Thursday a body of armed white men, some of whom were proved to have been at Rouse's Bridge on Tuesday when the whites promised to go home peaceably, went to the house of Dick Thompson (colored), a few miles from Rouse's Bridge, in Barnwell county. Here they found Thompson and one Edward W. Bush. Both were in the house unarmed, sitting on a bed. They were taken out of the house and carried down a lane. Thompson was allowed to go back. Bush was taken down to the foot of the lane, and in about half an hour three of the white men fired each two shots into him, killing him instantly. His wife was at the house with three young children when he was taken out, and the children called to the men, "Don't kill papa."

To prove the motive for the killing of these thirteen men whose deaths have been referred to, the prosecution introduced declarations of the alleged conspirators. The defendant, Atkinson, told Moore, one of the witnesses, before the occurrences, that the leading rascals of the Republican party were going to be killed before the election. That the Democrats would wade to their saddle-skirts in blood to carry the election. He advised Moore to join a Democratic club or he would not live until the election. The defendant, George W. Bush, told David Bush, in the presence of his wife, about two weeks before the riot, that he could not remain on his place unless he voted the Democratic ticket or refused to vote at all. On the morning of the day on which David Bush was killed, George W. Bush came to David's house. He was absent, but his wife was at home. About thirty armed and mounted white men were with him. He took out a list which he called a "dead list," and read from it the names of several prominent colored Republicans in that vicinity who were to be killed. On this list was the name of her husband. That evening, after her husband was killed, George W. Bush, with some of the men who were at her house in the morning, rode up. Bush with three or four others came to the house and told her her husband was killed, and his body was under a persimmon tree in the Kelsey field. On Monday, one Darius Weathersby (colored) was taken a prisoner by the whites. He was asked if he ever voted and if he would vote the Democratic ticket if turned loose. Some of the men said they were going to kill the leading men. John Scott was taken a prisoner the same day, and remained under guard that night. The white men told

him that night they were going to kill every d——d negro in the country. It was the leading men they wanted. They said they were going to breakfast on Simon Coker. One of the white men got Scott off at daylight, and told him the men would kill him. He hid him in a store at Ellenton and saved his life. One Anselen Kelly heard a conversation between two of the whites engaged in the riots some time before they took place. One of them in discussing the political campaign said that the plan was to kill eight or ten leading Republican negroes, and they could manage the balance. Berry Riley was told that if he voted the Republican ticket he would die, that the Democrats intended to carry the election if they had to wade to their saddle-skirts in blood. Willis Leddick heard the men of the company that went from Hamburg to join Captain Brown, on Saturday, September 16th, say they were going down to get Mink Holland, and stick his head up in Edgefield; that they were after the leading men; that this was a white-man's government and they were going to have it. Columbus Roundtree was told that the whites intended to adopt the Mississippi plan—kill a few of the niggers and scare the balance. The defendant, George W. Bush, said that the riot was not started altogether in behalf of Mrs. Harley, but to win the election. Two colored men who had been sent to Aiken on Sunday for the sheriff, were captured by the white men going from Aiken to Ellenton, when about one and a half miles from Aiken. They were compelled to go back home as prisoners. About four miles from Aiken they were compelled by some of these men to get down on their knees, and made to swear that they would vote the Democratic ticket. Colonel A. P. Butler asked Bryant Council, who was taken prisoner by the whites on Monday, what his politics were. He replied that he had not determined. Butler told him to fall in line. Some of Butler's men struck him over the head with a gun. Albert Carroll was told that the whites were going to carry the election on the Mississippi plan, the shotgun policy. H. J. Miller (white) told Carroll a week after the Hamburg riot that the Democrats intended to carry the election if they had to kill every negro in the whole country. (Miller was on the stand as a witness for the defence, and did not deny this fact.) O. N. Butler was consulted by the whites as to what should be done with Coker. He said, "Kill him. All we want to do is to kill the leaders and then we can rule the others." In reply to the testimony adduced for the prosecution the defence introduced evidence tending to show that the gathering of whites on Saturday and Sunday was for the purpose of assisting Captain Brown in executing the warrant for the arrest of Frederick Pope. That the conduct of the whites subsequently was justified by the action of the negroes, and that they were simply engaged in quelling a riot. That most of the negroes who were

shot or killed on Sunday and Monday were the aggressors, and were shot in self-defence. It was shown that Mrs. Harley and her son had been assaulted on Friday by two unknown negroes. Suspicion rested on Peter Williams and Frederick Pope. Williams was captured, was struck in the face by Mr. Harley, then attempted to run and escape, but was pursued, shot, and afterwards carried into Harley's house. Mrs. Harley at first said he was the wrong man, but after seeing his face she said he was one of the men who was at the house, but not the one who struck her. That afternoon Trial Justice Griffin issued a warrant for the arrest of Williams and Pope, and appointed A. P. Brown special constable to serve it. No return was ever made upon the warrant.

Saturday afternoon the whites gathered at Harley's, and started towards Rouse's Bridge to arrest Pope. Many of them slept at Matlock Church that night. Sunday morning they went on towards the bridge. That morning, Dunbar Lamar came for Trial Justice Griffin saying that Colonel A. P. Butler had sent for him. He went to within a short distance of the bridge, and found Butler there with about eight hundred white men. Butler requested him to go down and talk to the colored people; that he wanted to make one more effort to quell the riot. In regard to the shooting of Henry Campbell on Sunday morning, one Tavell swore that he saw a colored man in the field raise a gun and shoot, and that his mule was struck with shot. That he then fired, and shot the man apparently in the arm. Two witnesses, Ransom and Page, testified that before Campbell was shot, they were surrounded by several negroes, and that threats were made to kill them. Page said he told the negroes that they had a warrant for Pope, and that he saw him among them, but they said they intended to protect him. At the conference held between the whites and negroes one of the negroes asked if the agreement for peace had anything to do with their voting. The whites replied that it had not. Sunday afternoon the whites started to go towards their homes. Many of them remained all night at Myers's. That afternoon, one Solomon testified that about sixty negroes were drilling in front of his store, which was a short distance to the north of Union Bridges. Solomon made a list of their names in Hebrew, which his clerk, H. J. Miller, afterwards wrote out from his dictation. Towards dusk some of the white people passed Solomon's store to go across the bridges towards their homes in the direction of Ellenton. After four or five had passed, one Elmore Ashley passed on horseback. He testified that when about seventy-five yards from the bridge he was halted by some colored men there. One took his gun from him, but it was restored by another of the party. Some called out "Kill him!" He put spurs to his horse, and was fired at. Just as the gun was dischar-

ged his horse stumbled. He was not hurt. Several white men then rode down towards the bridge and fired at the negroes. The fire was returned. At the first fire from the whites Basil Bryant was instantly killed. A few of the white men were wounded with small shot. The whites retreated. Some went back to Myers's and reported that the negroes had ambushed and killed some of their number. Captain William D. Bush went to Augusta and reported all along the road that the negroes were rising and killing white men. Small bands of armed negroes were reported at various points about Ellenton on Sunday. Sunday night, about eight or nine o'clock, one John Williams (white) was killed near Cowden, a plantation between Jackson's Station and Ellenton. He was with a man named Stallings when he was killed. Stallings testified that he was shot by negroes who were in the woods.

Sunday night the telegraph wire was cut at the bridge just above Ellenton. Monday the whites, in command of A. P. Butler, went to the wreck of the train on the Port Royal Railroad. As they neared the road, there was a line of skirmishers deployed. A gun of some sort was fired by unknown parties, some of the shot from which struck one car of the freight train, while others struck the rails. Soon afterwards a colored man was seen crossing the track, and was shot and killed by the whites. (This man was Kit Finissee.) Colonel Butler sent orders to the skirmishers after this man was shot to be careful not to shoot their own men. O. N. Butler and some men from Augusta were met at this place. They joined the column and remained with it the rest of the day. From Cowden the whites went to Ellenton. On the way several prisoners were taken. On arriving at Ellenton, a negro fired into the whites from behind a wood-pile. He was killed. (This was John Kelsey.) No body of negroes at Ellenton then. There was a great deal of shooting by the whites at Ellenton in all directions. From Ellenton the whites went towards the Kelsey House and the plantation of Major Crossland, half a mile or more beyond there. As the head of the column neared the Kelsey House six or seven men ran out and fired. The column was well closed up. No white man was shot. The whites then fired and killed three of the men. The others escaped. After going up as far as Major Crossland's, the column returned to Ellenton by another road. A company of white men from Edgefield joined Butler at this time. A. C. Jordan, a son of the sheriff of Aiken county, met Butler at Crossland's. He had left Aiken in company with the sheriff about ten o'clock that morning. When within a few miles of Rouse's Bridge, the sheriff turned to go in that direction, as it was there that the negroes were who had sent for him. His son told him it would not be safe to go that way. They therefore went to Myers's, which they reach-

ed about three o'clock. The sheriff remained there, and told his son to go to Rouse's Bridge and to tell Colonel Butler, or whoever was in command; that he thought the whites were in the right this time, and that if he wanted any assistance in quelling the riot to let him know, and he thought he could get it. Butler said he thought he had sufficient men to quell them. He said he had been asked to go to Ellenton, as the negroes were massed there. The whites remained at Ellenton that night, and put out pickets. A detachment under Captain Brown went across Union Bridges and staid there all night. Monday evening a party of white men from Barnwell were fired into about a mile from Robbins's Station on the road to Ellenton. They were going to Ellenton. It was dark, and it could not be told who did the shooting. One Robert Williams was killed. Two others were wounded. Whites returned the fire. The whites fell back to Steel Creek Bridge. On Tuesday the main body of whites left Ellenton about seven o'clock to go to Rouse's Bridge, where the negroes were reported to be massed. The son of the sheriff, when nearing the bridge, was in command of the skirmishers on the left of the road. The skirmishers were dismounted. In their front were mounted "scouts." Some of the scouts testified that two negroes fired into them as they neared the bridge. Several of them returned the fire. By this time there was a great shouting across the bridge. When they reached the bridge the planks were off. The stream was forded, and the skirmish line advanced on the other side. It was then that the whites met the army officers. After the whites had agreed to disperse and go home, a request was made for volunteers to go to Ellenton, but Colonel Butler did not wish the men to go.

Dr. William S. Cannon testified that he was at Ellenton on Tuesday. Saw Coker there, and spoke to him. Didn't know the white men who had him in charge. They were mostly strangers. He remained at the station until about one o'clock, reading papers. When he left the depot he heard he had been shot half an hour before. His killing didn't create much excitement. Nobody seemed to know or care anything about it. He went home and ate dinner. After dinner rode back and looked at his body. He estimated the number of white men who were at Ellenton on Monday afternoon at from three hundred to five hundred. Their column was about half a mile long.

Testimony was given tending to show that on Monday morning, at Union Bridges, some of the negroes were noisy and were calling for "white blood." They had a drum Monday morning, and it was beaten when they went to Ellenton. No one was injured by the negroes at Ellenton or elsewhere on Monday, and no property was destroyed by them, so far as appeared by the evidence. A gin-house was burned on Sunday night some miles be-

low Ellenton. It was not shown by what means it was set on fire. It was also proved by the witnesses for the defence that several white families were at Myers's on Monday and Tuesday for protection. On Wednesday night, September 20th, James Patterson, the sheriff of Barnwell county, was wounded in the face and breast by shots fired at him when near Ashley's, five or six miles from Rouse's Bridge, in Barnwell county. He was riding in a buggy at the time with a friend. He could not tell who shot him. He remained that night at Ashley's, and went home the next day.

Trial Justice Griffin, a witness for the defence, testified that on Tuesday or Wednesday—he thought it was Tuesday—he held an inquest as to John Williams, the white man who was killed Sunday night. The jury did not view the body. Testimony was taken and the jury returned a verdict that deceased came to his death from gunshot wounds inflicted by parties unknown. On cross-examination, he said that Mr. Paul Hammond advised him not to go home that evening after the inquest. He said he had promised his wife that he would do so if he were alive. A pass was therefore given him, which was produced. It was as follows: "Silver Bluff, S. C., September 18th, 1876. Pass the bearer, Charles Griffin, on special business. A. P. Butler. Paul Hammond." The date is wrong. It should have been September 19th. Griffin left about half-past three o'clock for home. He lived towards Augusta, in Beech Island, some ten or fifteen miles from Silver Bluff. On his way home he was taken prisoner by a party of about thirty men, who were going towards Augusta. They cursed him, called him a d——d radical, and said they were going to kill him because he was a Republican. He pleaded for his life, and showed the pass which he had. They halted and consulted together, and finally released him. Before doing so, however, he promised not to vote the Republican ticket. Afterwards, he came up to the main party. He promised them that if they would spare his life, he would not give any of the names that were there. The witness was asked the names of any of the party. He replied that he could not give it, unless it were forced out of him. He was then asked if he felt that it would be unsafe to reveal the names now, and he said he believed the same party would, perhaps, hurt him if they could get him. Some of the same party he had seen on Sunday, at Rouse's Bridge.

In reply to the evidence for the defence, the prosecution introduced evidence to show that the colored men who were at Kelsey's did not fire guns at all. Also that the firing on Tuesday morning, at Rouse's Bridge, was commenced by the whites. Matt Scott (colored) was shot, and still carries the bullet under the skin. He was unarmed. He said the bullets whistled around him "like bees around a gum." His brother Isaac said he

and Matt were going down the hill to cross the bridge, to get with the rest of the negroes. That he didn't know there were any white people near. They were shot at, and he was shot in the right thigh. He turned and ran up the hill. He ran twenty or thirty yards, then turned and fired his gun—an old shot-gun. Then he ran across the hill, the white men after him. He fell into a deep gully, and thought that he thus saved his life.

The testimony having closed, and arguments having been made for the prosecution and defence, WAITE, Circuit Justice, charged the jury as follows:

The defendants, George W. Croft, Angus P. Brown, Abner W. Atkinson, George W. Bush, George B. Bush, Paul F. Bowers, Augustus McDaniels, William L. Bush, John Bowers, Whitmore W. Stallings, and John M. Bush, are on trial before you upon the second, third, fourth, and fifth counts of the indictment alone, as the first count has been adjudged to be insufficient in law. The second and third counts are predicated upon section 5520 of the Revised Statutes of the United States, which, so far as it is applicable to this case, provides that if two or more persons conspire to prevent by force, intimidation, or threat any citizen who is lawfully entitled to vote, from giving his support or advocacy, in a legal manner, toward or in favor of the election of any lawfully qualified person as a member of the congress of the United States, or to injure any citizen in person or property, on account of such support or advocacy, each of such persons shall be punished by fine or imprisonment, or both.

The second count charges, in substance, that the defendants, together with divers other persons, did unlawfully conspire together to prevent by force, intimidation, and threat, David Bush, a citizen of the United States, and of the state of South Carolina, and lawfully entitled to vote at any election by the people of Aiken county, from giving his support and advocacy, in a legal manner, toward and in favor of the election of Robert Smalls, a lawfully qualified person, as a member of the forty-fifth congress of the United States. To convict under this count it is necessary for you to find from the evidence. 1st. That David Bush was a citizen of the United States, that is to say, that he was born or naturalized in the United States, and subject to the jurisdiction thereof. 2d. That he was lawfully entitled to vote at any election to be held in Aiken county for a member of the congress of the United States, that is to say, that he was of the age of twenty-one years, or upwards, and had resided in the state of South Carolina one year, and in the county of Aiken sixty days, and that he labored under none of the disabilities named in the constitution of the state. 3d. That Robert Smalls was a lawfully qualified person for the office of a member of the

congress of the United States, or in other words, that he had attained the age of twenty-five years, and had been seven years a citizen of the United States, and was an inhabitant of this state; and 4th. That the defendants, or some of them, on or before the 18th of September last, unlawfully conspired among themselves or with others to prevent Bush, by force, intimidation, or threat, from giving support and advocacy to the election of Smalls as a member of the congress of the United States.

The third count differs only from the second in that it charges the conspiracy of the defendants to have been to injure Bush in his person and property, on account of his having given support and advocacy, in a legal manner, in favor of the election of Smalls as a member of the forty-fifth congress. To convict under this count, your findings must be the same as under the second, except in respect to the object of the conspiracy. As to that you must be satisfied from the evidence that the defendants, or some of them, unlawfully conspired among themselves or with others, with the intent to, and for the purpose of injuring Bush in his person or his property, because of his having given support and advocacy to the election of Smalls.

The fourth and fifth counts are predicated upon section 5508 of the Revised Statutes of the United States, which provides among other things, that if two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the United States, or because of having exercised the same, they shall be punished by fine and imprisonment, and shall be thereafter ineligible to any office or place of honor, profit, or trust, created by the constitution or laws of the United States. The fourth count charges that the defendants, together with divers other persons, to the jurors unknown, conspired to injure, oppress, threaten, and intimidate one David Bush, a male citizen of the United States, of African descent, and duly qualified to vote at any election by the people of Aiken county, in the free exercise of the right and privilege of voting at a general election by the people on the Tuesday after the first Monday in November, 1876, on account of his race and color. To convict under this count you must be satisfied from the evidence: 1. That Bush was a citizen of the United States and a qualified voter of Aiken county, the same as under the former counts. 2. That the defendants, or some of them, conspired among themselves or with others to injure, oppress, threaten, or intimidate him in the free exercise of his right and privilege of voting at the election in November last; and 3. That this was done on account of his race or color. The fifth count differs only from the fourth in that it charges the conspiracy to have had special reference to the election of a mem-

ber of congress for the Fifth congressional district of this state, to be voted for at that election. The controlling element in the offence charged in both these counts is the race or color of Bush. It is not enough that the defendants may have conspired against him on account of his political opinions, or on account of his support or advocacy of any political party, for that is not the crime of which they are in these counts accused. In the second and third counts such is, in effect, the charge, but in the fourth and fifth it is not. To convict under the latter counts it must appear that the object of the defendants in their unlawful combination was to interfere with his right and privilege of voting on account of his race or color, without regard to his political belief or association. As it appears from the evidence that Bush was killed on the 18th of September last, it follows that you must find that the conspiracy against him, whatever may have been its character, was formed on or before that day.

It has not been attempted on the part of the defence to contradict the evidence offered by the government to prove that Bush was a colored man, or that he was a citizen of the United States, or a lawfully qualified voter of Aiken county, or a member of the political party which, on or about the 15th of September last, put Smalls in nomination for election as a member of congress for the congressional district in which Aiken county is situated. It is not probable, therefore, that you will have any difficulty in arriving at a conclusion upon these preliminary questions. The real controversy before you is as to the existence of the alleged conspiracy. It is to this point that the evidence to which you have been listening with such attention for so many days has been principally directed. And here it is proper to say in the outset that the defendants are not on trial for the killing of Bush, or of any other of the numerous homicides that were committed during the disturbances which followed the alleged attack by two negroes upon Mrs. Harley and her little son, near Silverton, on the morning of Friday, the 15th of September. The shocking details of these transactions, which have been given in evidence, are only to be considered by you with reference to their bearing upon the existence of the alleged conspiracy to prevent by force, intimidation, or threats the support and advocacy by Bush of the election of Smalls, or to intimidate him on account of his race or color in the free exercise of his right to vote. However much you may deprecate the acts which have been described by the witnesses, the punishment of those guilty of them has been committed by the laws to other courts than this. Power for that purpose exists in the government of the state, and under our political system the courts of that government can alone be resorted to for the trial and conviction of such offenders. But the acts themselves are

proper subjects for your consideration, so far as they legitimately tend to prove the crime charged in this indictment, and which has been made an offence against the laws of the United States. It is not for you to consider whether these laws are wise or unwise. That was the duty of congress when it passed them, and, having been passed, neither you nor the court have at this time anything else to do but to see that they are properly enforced. Their object is to protect the citizens of the United States in the lawful enjoyment of rights which have been secured to them by the constitution and laws of the United States, and while in this case they have been resorted to on account of the alleged violation by white men of the privileges of colored men, they are equally open to the whites against the blacks, should occasion ever require. So far from arraying race against race, their object is to prevent such a calamity. Neither are you to inquire at whose instance the indictment has been found or the trial had. Equally unimportant is it to you or to us whether the state or its officers have been unable or unwilling to punish offences against its own laws, or to bring to judgment in its own courts the violators of its own peace. It is enough for us that the government of the United States has seen fit, through its own appropriate department, to bring this case here for judicial investigation.

We do not propose to comment at all upon the evidence which has been adduced before you. You have listened to it patiently as it came from the witnesses, and we have no doubt will consider it in your room with all the care and judgment the importance of the case demands. The claims, both of the government and the defendants, have been argued before you by able counsel. There has been no attempt to establish the conspiracy which is charged by direct proof. No witness has been brought before you to swear that he was present when the unlawful combination alleged was in terms agreed upon by the parties or any of them. The testimony is wholly circumstantial, and consists of the acts and declarations of the parties named in the indictment, and of those who are alleged to have been their co-conspirators. In judging of the proper effect of these acts and declarations as evidence to sustain the indictment, you must consider them with reference to the circumstances under which the parties were placed at the time, and the rumors which, acting as prudent men, they would then have reasonable cause to believe were true.

On the part of the defendants it is claimed that at the commencement of the unfortunate occurrences which are in evidence, they were acting as officers of the law for the arrest and punishment of the two negroes who made the attack upon Mrs. Harley, and afterwards for the suppression of a riot which arose out of an attempt by the colored people

in that vicinity to resist them in the performance of their duties. For this purpose it has been shown that a warrant was sued out before Trial Justice Griffin for the arrest of Peter Williams and Frederick Pope, charged with the alleged assault, and that Captain Brown, one of the defendants, was deputed as a special constable for its service. By the laws of the state every constable is a conservator of the peace, and may take into custody and carry to the nearest trial justice, any person or persons who may be, in his view, engaged in riotous conduct or open violation of the peace and refuse, upon his command, to desist therefrom; and also any person who may, in his view, commit any felony or misdemeanor; and for the purpose of preserving the peace, and also executing any criminal process. Every constable has the power of ordering out such posse comitatus to his assistance as may be necessary to enable him to discharge his duty. In suppressing riotous assemblages, the officers of the law and those who assist them, in case of resistance, may attack, wound, and, if necessary, kill those who resist, taking care to commit no unnecessary violence or to abuse this power legally vested in them. Every one is justified in doing what is necessary for the faithful discharge of the duties annexed to his office, although he is doubly culpable if he wantonly commits an illegal act under the color or pretext of the law. This is the language of Lord Mansfield, as it has been read to you by one of the counsel for the defendants in his argument, and correctly expresses the rule of law applicable to such a case. You may properly be governed by this rule in the consideration of the evidence in this case. If the acts done by the defendants and those engaged with them in giving effect to their common purpose were no more than were necessary for the execution of the warrant which Captain Brown had for service, or the suppression of what was in fact, or may have been supposed to be, a riotous assemblage; if no unnecessary violence was committed, and the power which was lawfully vested in the officer and his posse was not in any respect abused, then you may with propriety conclude that the sole object of the parties was to execute the warrant and suppress the riot. But if you, on the contrary, find that unnecessary violence was employed and that illegal acts were wantonly committed, then you may with equal propriety further inquire whether the parties in their combined action had any other object in view, and if so, what it was. It is claimed on the part of the government that the process of the law was used only as a pretext, and that the real purpose of the parties was to carry into effect a conspiracy which had already been formed by them or some of them against Bush. This is the precise question which you are called upon to determine, and you are compelled to determine it upon circumstantial evidence alone.

That kind of evidence, if full and complete, is as convincing as that which is called direct. But to warrant a conviction upon such evidence alone, the circumstances proven must not only be consistent with the theory of the guilt of the defendants, but they must be entirely inconsistent with any other rational conclusion.

To convict under this indictment it is not necessary to find that the conspiracy charged was formed against Bush alone. It is sufficient if it is made to appear to your satisfaction that he was included among persons actually conspired against. Neither is it necessary that he should have been mentioned by name in the agreement or mutual understanding of the conspirators. It is sufficient if you find that the conspiracy was formed against a class which included him, and that in the execution of the common purpose it was actually carried into effect against him. Each member of a conspiracy is responsible personally for the acts of every member thereof, done in furtherance of its illegal purposes, whether he be himself present or not. It follows that the acts and declarations of one of the conspirators while actually engaged in giving effect to the common purpose, may be given in evidence against his co-conspirators. Having a common purpose, the acts and declarations of one while carrying that purpose into effect are the acts and declarations of all. But isolated acts of violence by individuals who may have been engaged in the conspiracy cannot be used against the others, unless it appears that they were done in furtherance of the common purpose. All are bound by them if they resulted from the original unlawful agreement between the parties to accomplish by their concerted action the proposed result. All who were present when the acts of violence, which are relied upon as evidence of the conspiracy in this case, were committed, may not have been conspirators. It is possible that some may have supposed that the whole object of the assemblage was to suppress a riot and preserve the peace. Others, who were in fact the conspirators, may have taken advantage of the occasion to carry their unlawful purposes into effect. Whether this was so or not is for you to determine, and in order that justice may be done and the guilty punished while the innocent escape, the law permits you to so frame your verdict as to accomplish that end. It may be—1. Guilty as to all upon all the counts. 2. Not guilty as to all upon all the counts. 3. Guilty as to some upon all the counts, and not guilty as to others. 4. Guilty as to some upon one or more of the counts, and not guilty as to the others. The burden of proof, gentlemen, is upon the government. It is a wise maxim of the law in favor of life and liberty, that every man is presumed to be innocent until he is proven guilty, and this presumption is to continue with your sitting as jurors, until it has been overcome by the testimony beyond a reasonable doubt. But

a reasonable doubt is something more than a captious doubt, a mere vague notion that possibly the accused may be innocent. It must be a doubt for which a reason may be assigned. It need not be a reason sufficient to convince another, but it must be such as may properly influence the mind of one who is honestly endeavoring to perform his solemn duty as a juror.

And now in conclusion, gentlemen, we say to you that both the government and the defendants are entitled to the independent judgment of each one of you upon the issues presented for your consideration. It is sometimes the case that jurors agree that the vote of a majority, or some other number less than the whole, shall be adopted as the verdict to be returned. Such an arrangement is not in accordance with the requirements of the law. Each of you must find the verdict he agrees to upon his own oath, and no one has the right to shift the responsibility of his final action from his own conscience to that of one or more of his fellows. You may be convinced by his reasons, but you ought not to put yourself in a position to become bound by his simple vote. It is your duty to consult together, to compare your recollections of the testimony, to consider carefully among yourselves the bearings it has upon the facts to be established, and to harmonize your views if possible, but your verdict should be in accordance with your own deliberate judgment.

A single word more. It has been argued before you that this is a political trial and that the prosecution has been instituted and carried on for political purposes alone. Such arguments, gentlemen, should have no influence with you. The case to you and to the court also is political only in the sense that it grows out of an alleged offence against the political rights of a citizen of the United States, secured to him by the national constitution. That a number of citizens of the United States have been killed, there can be no question. But that is not enough to enable the government of the United States to interfere for their protection. Under the constitution that duty belongs to the state alone. But when an unlawful combination is made to interfere with any of the rights of national citizenship secured to citizens of the United States by the national constitution, then an offence is committed against the laws of the United States, and it is not only the right, but the absolute duty of the national government to interfere and afford to its citizens that protection which every good government is bound to give. The case, as alleged in this indictment, is such a case, and you, as citizens, are bound to lift yourselves above the political arena, and render your verdict regardless of popular clamor or partisan excitement. The statute which is to-day invoked for the 'punishment of an offence against a colored man, may to-morow be used for the protection of a white man. All citizens of the United States, whether they be white or black, are included within its provisions.

You have, gentlemen, a solemn and important duty to perform, and the case is committed to your most careful consideration.

The jury, after remaining out over thirty hours and being unable to agree, except as to Abner W. Atkinson, whom they found not guilty, were discharged, and a mistrial was entered as to the other defendants.